HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMES A. NOYES, a married man,

    Plaintiff,

v.

STATE FARM GENERAL INSURANCE COMPANY; STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, STATE FARM LIFE INSURANCE COMPANY, STATE FARM FIRE AND CASUALTY COMPANY; DOE COMPANIES 1-5,

    Defendant.

Case No. C08-5032 RBL

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant's motion for Summary Judgment [Dkt. #23]. The Court has reviewed the materials submitted for and against said motion and has denied Defendant's request for oral argument. For the reasons set forth below, the motion is GRANTED.

**I. Introduction**

Plaintiff was a State Farm insurance agent from 1961 until November, 2004, when he submitted a letter notifying Defendant of his retirement. Dkt. #26-4, Noyes Dep., p. 31 (Salgado Dec. p. 6),

(Document Sealed). The terms of the relationship between State Farm[1] (Defendant) and Plaintiff are set forth in a written Agent's Agreement, "AA3"[2]. *See e.g.* Dkt. #26-3, Agent's Agreement Form AA3 (Salgado Dec. pp. 53-61). Pursuant to AA3, Plaintiff operated as an independent contractor and exclusively offered Defendant's insurance to potential policy holders. *Id.* Defendant has used similar "exclusive agents" for over fifty years [Dkt. #23]. Plaintiff was not required to pay fees or any other money to Defendant in order to become an independent contractor agent. Dkt. #29, Noyes Dep., p. 92 (Salgado Dec. pp. 14-24).

The current action concerns the events leading up to Plaintiff's retirement on November 30, 2004. State Farm began investigating complaints of sexual harassment against Plaintiff after receiving a letter from one of Plaintiff's employee's dated November 5, 2004 [Dkt. #26-3] (Document Sealed). On November 11, 2004, Mr. Gary Gipson, an audit investigator for State Farm, interviewed three female employees and discovered detailed accounts supporting claims of sexual harassment against Plaintiff by the three women. *Id.* On November 15, 2004, Mr. Gipson interviewed Plaintiff regarding the sexual harassment claims and the specific allegations [Dkt. #23]. On November 18, 2004, Plaintiff met with Ms. Carolyn Lee, Agency Vice President for State Farm, and Mr. Gipson again to discuss the sexual harassment claims. *Id.* Statements made at this meeting are central to Plaintiff's claims in the pending action and are discussed in greater detail below. However, on November 23, 2004, Plaintiff submitted a letter notifying Defendant of his retirement effective November 30, 2004 [Dkt. #26-4] (Document Sealed).

Plaintiff filed suit in Pierce County Superior Court on November 7, 2007, and the matter was

---

[1] Plaintiff's Agent Agreement includes an appointment for Defendants State Farm Mutual Automobile Insurance Company, State Farm Life Insurance Company, State Farm Fire and Casualty Company and State Farm General Insurance Company.

[2] The Agent's Agreement has been updated several times since 1961. As such the Court refers to the most recent Agent's Agreement as "AA3."

ORDER
Page - 2

removed to this Court on January 15, 2008[3] [Dkt. #1].

Plaintiff has offered materially conflicting recounts of the November 18, 2004 meeting with Ms. Lee and Mr. Gipson. In his deposition dated October 14, 2008, Plaintiff gives the following recount of the meeting and the limited facts he could recall regarding what he perceived to be a threat to his retirement benefits:

> Q   [Questioning Plaintiff] What else do you recall?
> A   [Plaintiff Answering] She [Ms. Lee] said something to the effect that "Jim, I think you had better retire." And I said, "why should I retire?" And she says [sic], "If you don't, and State Farm will bring up [sic] all your previous employees"–and I've forgotten the wording she used–"and question them about activities in the office," etcetera, etcetera. *She [Ms. Lee] made reference to retirement at one point–retirement income*, I'm sorry, *which led me to believe that she was going to jerk my retirement income if I didn't retire*. (Emphasis added).
> Q   Can you recall–
> A   *I don't remember the exact words*. One word I remember very well is that I asked her "if–if I were to retire, when would you want me to retire?" and she almost angrily said, "right now." And I think I probably looked really shocked. And then she said, "well, by the end of the month," which was like two weeks away, or a week and a half away or something. (Emphasis added).
> Q   Anything else you can recall about the meeting with Ms. Lee?
> A   I don't recall any right now.
> . . .
> Q   You indicated that Ms. Lee made reference to retirement income at one point, and I think you said that you couldn't remember the exact words?
> A   *True. I cannot remember the exact words*. (Emphasis Added).
> Q   Can you remember anything about the reference to retirement income she made?
> A   *I can't remember the words. I remember the feeling*. (Emphasis Added).
> Q   And that led you to believe that somehow they would jerk your retirement–
> A   Absolutely.
> Q   –Away?
> A   Yeah. *She used words that implied that my retirement could be in jeopardy*. I don't remember the words.
> Q   Do you have any documents that would refresh your recollection?
> A   No. That's why I hope that Gibson [sic] was taking notes.
> Q   Can you remember anything else about the meeting on Thursday with Ms. Lee?
> A   I know this is critical, and I wish I could.

---

[3] While neither party to the action raised the issue, it should be noted that Plaintiff's Franchise Investment Protection Act (FIPA) claims are barred by the Statute of Limitations. RCW 4.16.130 provides a 2-year statute of limitations period as a "catchall" for statutes that otherwise fail to specify a limitations period. *See also Unisys Corp. v. Senn*, 99 Wn.App. 391, 395, 994 P.2d 244 (2000). Plaintiff's FIPA claims would have accrued at the latest on November 30, 2004 (upon Plaintiff's retirement), and would have been time-barred on December 1, 2006.

ORDER
Page - 3

Dkt. #29, Noyes Dep., p. 150-53 (Salgado Dec. pp. 22-25). However, in a declaration filed over five-months later on February 20, 2009, Plaintiff seems to recall more concretely a direct threat made by Ms. Lee at the November 18, 2004 meeting:

> "When I asked what would happen if I did not retire, she [Ms. Lee] informed me that a full investigation would be done *and I could lose my retirement benefits. While it is true I cannot remember the exact words she used*, she made it very clear that my retirement income was in jeopardy if I did not immediately retire. I am unmistaken in this point that *she directly threatened my retirement benefits* and that the only way those benefits would not be placed in jeopardy was to retire immediately" [Dkt. #28], (Noyes Dec., pp.4-5).

While Plaintiff now alleges that Ms. Lee made a "direct threat" to his retirement benefits, Plaintiff has yet to provide any actual statements made by Ms. Lee at the November 18, 2004 meeting. It is important to point out that in the first recount of the meeting, Plaintiff alleges only that he "felt" that Ms. Lee "implicitly" threatened his retirement benefits, while in the second recount of the meeting he alleges a "direct threat" against his retirement benefits occurred[4].

It is uncontested that Ms. Lee lacks the authority to revoke Plaintiff's retirement benefits. Dkt. #29, Lee Dep., p. 30 (Salgado Dec., p. 29). Plaintiff's retirement benefits are secured by the AA3 contract entered into jointly by Plaintiff and State Farm. *See e.g.* Dkt. #26-3, Agent's Agreement Form AA3 (Salgado Dec. pp. 58-61) (manner in which agent is terminated is irrelevant to payment of retirement benefits).

Plaintiff pursues the following claims: (1) common law fraud, (2) common law negligent misrepresentation, (3) breach of duty of good faith and fair dealing required by the Franchise Investment Protection Act (FIPA), (4) fraud under the FIPA, and (5) unfair and deceptive acts in violation of

---

[4]"Retirement benefits" as used in this order are those payments referred to in the AA3 Agreement, Sections IV and V. These payments generally refer to percentages of payments an agent continues to receive for the years after termination based on the policies he or she personally produced as an active agent for the insurance company.

ORDER
Page - 4

1  Washington's Consumer Protection Act RCW 19.86[5].  Defendant moves for summary judgment on all of
2  the above claims.

## II. Discussion

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. At 251-52.  The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.  If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323-24.

**A. Common Law Fraud Claim**

Plaintiff claims that Defendant fraudulently induced his retirement when Ms. Lee improperly threatened his retirement benefits at the November 18, 2004 meeting.  To succeed with a common law fraud claim a plaintiff must prove the following nine elements: (1) a representation of an existing fact, (2) the fact's materiality, (3) falsity, (4) the speaker's knowledge of the falsity or ignorance of its truth, (5)

---

[5]Plaintiff has abandoned his claim for age discrimination under the Washington Law Against Discrimination [Dkt. #27].

the speaker's intention that it be acted upon by the plaintiff, (6) the plaintiff's ignorance of its falsity, (7) reliance, (8) plaintiff's right to rely, and (9) damages[6]. *Martin v. Miller*, 24 Wn.App. 306, 308, 600 P.2d 698 (1979); *see also Stiley v. Block*, 130 Wash.2d 486, 505, 925 P.2d 194 (1996).

Plaintiff has failed to produce evidence supporting the requisite elements of his common law fraud claim. In Plaintiff's first recount of the November 18, 2004 meeting he could not offer any statements made by Ms. Lee which would support a representation of existing fact for his fraud claim. The alleged fraudulent implication made by Ms. Lee was that she had the power to revoke Plaintiff's retirement benefits, when in fact she did not have such power under the terms of the Agent's Agreement. Dkt. #26-3, Agent's Agreement Form AA3 (Salgado Dec. pp. 53-61). Even if Ms. Lee had implied that she could revoke Plaintiff's retirement benefits, such a statement would not qualify as an existing fact. Viewed in the light most favorable to Plaintiff, the only known facts are that he was left with a "feeling" or "impression" that his retirement benefits would be "jerked" from him at some point in the future. Dkt. #29, Noyes Dep., p. 150-53 (Salgado Dec. pp. 22-25). Plaintiff stated "[Ms. Lee] used words that implied that my retirement could be in jeopardy. I don't remember the words." *Id*. Fraud requires the misrepresentation of existing fact. Plaintiff has not asserted any misrepresentation of existing fact; rather, Plaintiff asserts that he inferred from what Ms. Lee was saying that his retirement benefits would be in jeopardy if he did no retire. Plaintiff fails to offer any factual support for this assertion, other than his "gut feeling" in his deposition given on October 14, 2008.

Plaintiff's slightly altered recount of the meeting given in his February 20, 2009 declaration does not compel a different conclusion. Instead of relying on his gut feeling, Plaintiff now alleges that Ms. Lee informed him that he could lose his retirement if he did not retire and that Ms. Lee directly threatened his retirement benefits. Dkt. #28, Noyes Dec., p. 4. In any event, Plaintiff still fails to establish a

---

[6]Each element must be proved by clear, cogent, and convincing evidence. *Martin*, 24 Wn.App. at 308.

ORDER
Page - 6

representation of existing fact. Instead of relying on a "feeling" or "impression" that Ms. Lee would revoke his retirement benefits, Plaintiff now cites to alleged direct threats to his retirement benefits coming from Ms. Lee during the meeting. While Plaintiff has not produced any statement that Ms. Lee made regarding the threat to his retirement benefits, he now alleges that such a statement was made. Put another way, on October 14, 2008, Plaintiff could not recall any statements threatening his retirement benefits; however, on February 20, 2009, over four months later, Plaintiff recalls statements directly threatening his retirement benefits (although he is still unable to recall any of the words used in those threats). Even if the Court were convinced that Ms. Lee made the alleged direct threat, such would still not suffice for a representation of an existing fact. The alleged threat to his retirement benefits is not a current fact; rather, it is a hypothetical alternative in the event that Plaintiff did not immediately retire.

The United States Supreme Court has rejected parties' efforts to use similar contradictions in avoiding summary judgment stating, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999). Plaintiff offers no explanation for the disparity between his October 14, 2008 and February 20, 2009 testimonies. Moreover, he offers no actual statements made by Ms. Lee at the meeting amounting to representations of existing fact that meet the requirements of a fraud claim. At most, Plaintiff offers his interpretation of what Ms. Lee said, and that what she said amounted to a direct threat.

Plaintiff also fails to prove at least two other elements of his fraud claim, namely, that he had a right to rely on information from Ms. Lee in retiring, and that damages resulted from his reliance. Assuming arguendo that a representation of fact was made by Ms. Lee to Plaintiff at the November 18, 2004 meeting regarding a threat to his retirement benefits, Plaintiff would still have no right to rely on Ms. Lee's representation. Plaintiff was himself a party to the AA3 contract with State Farm, which apparently controlled his retirement benefits. Plaintiff signed the contract himself and is assumed to be

put on notice of the terms therein. Simply because an administrative official of State Farm told Plaintiff that he could lose his retirement benefits does not make it so. Moreover, such a statement fails to establish grounds for an actionable fraud claim. Plaintiff has struggled in demonstrating any way in which he was justified in relying on Ms. Lee's alleged statements regarding his retirement benefits. Plaintiff has never articulated any factual scenario which would allow Ms. Lee to actually carry out the alleged threat and jeopardize his retirement benefits. Plaintiff had a right to rely on the AA3 contract and its terms (a legally binding agreement); however, he had no reason to rely on the representations of Ms. Lee who was powerless to affect the reciprocal obligations under the contract or in any way empowered to alter its terms.

In an attempt to support his damages claim, Plaintiff argues that but for his forced retirement, he would have worked at his position for another seven years [Dkt. #27]. This argument is unconvincing for two reasons. First, there is a wealth of evidence against Plaintiff in the three sexual harassment claims by his employees in November of 2004. *See e.g.* Dkt. #26-3, Special Activity Report, pp. 87-102, (Salgado Dec., Ex.2 pp. 47-51., Ex.3 pp. 1-11). Indeed, State Farm settled with the three women for about $75,000.00 total. Dkt. #26-2, Noyes Dep., p. 215 (Salgado Dec. pp.14-24) (Document Sealed). The ongoing risk posed by employing Plaintiff would have, and indeed did, move State Farm to quickly begin the termination review process against Plaintiff. The harassment letter was submitted to State Farm on November 5, 2004, and by November 18, 2004 Plaintiff was engaged in termination discussions with Ms. Lee and Mr. Gipson.

Second, notwithstanding the sexual harassment settlement, Plaintiff's employment with State Farm was terminable by either party at any time with or without cause. Had the sexual harassment claims not amounted to a financial burden to State Farm, Plaintiff would still be subject to termination at any point at the discretion of State Farm. State Farm could have fired Plaintiff for a litany of legal reasons including its desire or need to avoid any bad publicity associated with Plaintiff's alleged sexual

harassment toward his employees. In any event, Plaintiff's claim that he would have worked another seven years but for his forced retirement does not follow logically. Because Plaintiff fails to establish several elements of his common law fraud claim, Defendant's motion for summary judgment on this issue is GRANTED.

**B. Negligent Misrepresentation**

Plaintiff also alleges that Defendant negligently misrepresented that it could jeopardize Plaintiff's retirement benefits if he did not immediately retire. Negligent misrepresentation claims require a plaintiff to establish the following six elements: (1) that the defendant supplied information for the guidance of plaintiff in a business transaction that was false, (2) that defendant knew that information was provided to guide plaintiff in a business transaction, (3) that defendant was negligent in obtaining or communicating the false information, (4) that plaintiff relied on the false information, (5) that plaintiff's reliance on the information was justified, and (6) that the false information was the proximate cause of plaintiff's damages. *Lawyers Title Ins. Corp. v. Baik*, 147 Wn.2d 536, 545, 555 P.3d 619 (2002).

As was the case with Plaintiff's fraud claim, there is insufficient evidence to support several elements of the negligent misrepresentation claim. Plaintiff offers no evidence of anything Ms. Lee actually said which would qualify as a "false statement" to Plaintiff in the November 18, 2004 meeting. Plaintiff's later assertion that Ms. Lee directly threatened his retirement benefits does not save his negligent misrepresentation claim. Once again, the Court must consider the contradictory nature of the testimonies submitted by Plaintiff in support of his claim. As was the case with the fraud claim, Plaintiff offers no explanation for the disparity between his two testimonies. Plaintiff has stated on several occasions that he cannot remember any of the words used by Ms. Lee in the meeting, and as such he has failed to establish the first element of his negligent misrepresentation claim.

Plaintiff cannot establish that Defendant was negligent in obtaining or communicating false information. Because Plaintiff cannot establish that false information was actually communicated, he

ORDER
Page - 9

cannot logically establish that said information was communicated negligently.

Plaintiff cannot establish that his reliance on false information was justified. Assuming arguendo, that their was a communication of false information by Ms. Lee to Plaintiff, any reliance on that information by Plaintiff was unjustified. For the same reasons that Plaintiff had no right to rely on Ms. Lee's representations for his fraud claim, he is similarly unjustified in relying on her representations for his negligent misrepresentation claim. Because Plaintiff fails to establish several elements of his common law negligent misrepresentation claim, Defendant's motion for summary judgment on this issue is GRANTED.

**C. FIPA Claims**

Plaintiff claims that his relationship with Defendant triggered protection under the Franchise Investment Protection Act (FIPA). RCW 19.100 *et seq*. Specifically, Plaintiff claims Defendant committed fraud and breached its duty of good faith and fair dealing under the FIPA. The Washington State Legislature adopted FIPA to curb franchisor sales abuses and unfair competitive practices. *East Wind Express, Inc. v. Airborne Freight Corp.*, 95 Wn.App. 98, 102, 974 P.2d 369 (1999) (Citations omitted). The FIPA defines only certain business relationships as constituting a franchise. It defines a franchise as:

> (a) An agreement, express or implied, oral or written, by which:
>     (i) A person is granted the right to engage in the business of offering,
>     selling, or distributing goods or services under a marketing plan prescribed
>     or suggested in substantial part by the grantor or its affiliate;
>     (ii) The operation of the business is substantially associated with a
>     trademark, service mark, trade name, advertising, or other commercial
>     symbol designating, owned by, or licensed by the grantor or its affiliate; and
>     (iii) *The person pays, agrees to pay, or is required to pay, directly or
>     indirectly, a franchise fee*.

RCW 19.100.010(4) (emphasis added). Every element must be met in order to qualify the business relationship as a franchise and avail a plaintiff of the protections of the FIPA.

Plaintiff has failed to establish the franchise fee requirement. Plaintiff admits that he has not paid

ORDER
Page - 10

any money to State Farm for a franchise fee. Dkt. #24, Noyes Dep., pp. 92-102 (Salgado Dec., pp. 14-24). However, Plaintiff argues that by exclusively limiting his business to issuing only State Farm policies, and by allowing his customers and their information to become trade secrets of State Farm, he has indirectly paid a franchise fee. A franchise fee is defined as

> any fee or charge that a franchisee . . . is required to pay . . . including but not limited to payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or nor referred to as royalty fees, any payment for the mandatory purchase of goods or services or any payment for goods or services available only from the franchisor . . .

RCW 19.100.010(12). Indirect franchise fees have been found to exist only in situations where some amount of money has changed hands between franchisee and franchisor. *See e.g. Blanton v. Mobile Oil Corp.,* 721 F.2d 1207, 1220 (9th Cir. 1983) (holding that a requirement that franshisee purchase motor oil from franchisor at certain amounts above fair market value constitutes payment of an indirect franchise fee).

Because Plaintiff has paid no money to State Farm he cannot, either directly or indirectly, satisfy the requirement of a franchise fee. The definition of a franchise fee does not purport to include an abstention from sales in other competitors' products or services. Nor does the definition purport to include customer's information as a form of payment by the franshisee constituting a franchise fee. Plaintiff's argument for a more expansive interpretation of what constitutes an indirect franchise fee finds no support in case law. Moreover, the plain meaning of the statute suggests that some exchange of money between franchisee and franchisor is required to satisfy the franchise fee requirement.

Secondly, and in any event, insurance actions and transactions regulated under the insurance code are expressly exempted from the FIPA. The FIPA states:

> (b) The following shall not be construed as a franchise within the meaning of this chapter:
> (ii) Actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state;

ORDER
Page - 11

RCW 19.100.010(4). The action of terminating an insurance agent is generally regulated by the insurance commissioner under WAC 284-17-445, which states "(1) An insurer may terminate an appointment by sending written notice of termination to the agent and by sending a notice of termination of the appointment to the commissioner electronically through NIPR, the commissioner's web site, or on the form provided by the commissioner for that purpose."

Because Plaintiff was an insurance agent and his complaint centers on the action of his termination, RCW 19.100.010(4)(b)(ii) specifically exempts him from the protections of the FIPA. Plaintiff cannot avail himself of the protections of FIPA for the reasons stated above; therefore, Defendant's motion for summary judgment on these issues must be GRANTED as a matter of law.

**D. Consumer Protection Act Claim**

Plaintiff initially claimed that his termination violated Washington State's Consumer Protection Act (CPA). RCW 19.86 *et seq.* In his response to Defendant's motion for summary judgment, Plaintiff changed his position stating "this claim rests upon the Court's determination on whether FIPA is available in this case. If FIPA applies, so does the Consumer Protection Act claim" [Dkt. #27]. While the connection between the CPA and the FIPA is unclear, Plaintiff's CPA claim fails in any event.

In order to survive a summary judgment challenge, a plaintiff asserting a CPA claim must establish all five of the following elements: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) with a public interest impact; (4) injuring the plaintiff in his or her business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

Plaintiff fails to address any of the five elements in his responsive briefing. Most notably lacking from the facts presented is any impact Plaintiff's termination would have had on the public's interest. The CPA is meant to deal with situations which transcend mere private party contracting disputes and

which have affected or will affect consumers generally. *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744-45, 935 P.2d 628, 635 (1997). Because Plaintiff has failed to show any public interest impact, Defendant's motion for summary judgment on this issue is GRANTED as a matter of law.

### III. Conclusion

For the reasons stated above, Defendant's motion for summary judgment on all issues is hereby GRANTED. Plaintiff's complaint is dismissed with prejudice.

IT IS SO ORDERED.

Dated this 1st day of April, 2009.

*/s/ Ronald B. Leighton*

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE